UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 2, 2017

ERICA MELTZER,

                                    Plaintiff,

                    v.

DEBBIE STIER and THE PERFECT SCORE
PROJECT, LLC,

                                    Defendants.

------------------------------------------------------X

15 Civ. 6184 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

The events underlying this litigation prove the adage that friends and business do not mix. Erstwhile friends Erica Meltzer and Debbie Stier both work in the Scholastic Aptitude Test ("SAT") tutoring business and both publish SAT preparation materials. In 2015, Plaintiff Meltzer commenced this action against Defendant Stier and her single-member limited liability company, The Perfect Score Project, LLC (collectively, "Defendants"), alleging copyright infringement.[1] It is not the merits of Plaintiff's claims that bring the parties before the Court, but rather a dispute concerning their purported resolution. Following three settlement conferences before Magistrate Judge James C. Francis IV, the parties discussed and revised a proposed settlement agreement; Defendant refused to enter the agreement, and thus began a

---

[1]     For reasons explained below, the corporate Defendant played no role in the events underlying this motion. All references to "Defendant" refer to Stier in her individual capacity.

protracted fight over the whether this lawsuit had nonetheless settled.  Now before the Court is Plaintiff's motion to enforce the purported settlement agreement.  For the reasons that follow, Plaintiff's motion is denied.

## BACKGROUND[2]

Plaintiff commenced this action on August 6, 2015.  After reciting her copyright in a book entitled *The Critical Reader: The Complete Guide to SAT Critical Reading*, Plaintiff alleged that, beginning in January 2015, Defendants published a tutorial on their website under the title "28-Day Critical Reading Intensive" that infringed on Plaintiff's copyright.  (Compl. ¶¶ 2, 8).  In particular, Plaintiff alleged that this section of Defendants' website "infringes on Plaintiff's copyright in each version of The Critical Reader" insofar as it is "copied from The Critical Reader in substance, style, and organization."  (*Id.* at ¶¶ 10, 23).  To compensate Plaintiff for the resulting damage and "irreparable harm," Plaintiff sought an order enjoining any further infringement by Defendants and directing Defendants to remove the offending material from their website and deliver to the Court all infringing material for destruction or

---

[2]     This Opinion draws on facts alleged in the Complaint (Dkt. #1 ("Compl.")), as well as averments contained in Plaintiff's Affidavit in Support of Motion to Enforce March 24, 2016 Settlement Agreement (Dkt. #70 ("Pl. Aff.")), and the Declaration of Debbie Stier (Dkt. #72 ("Stier Decl.")).  For ease of reference, the Court refers to the Memorandum of Law in Support of Plaintiff's Motion to Enforce the Parties' March 24, 2016 Settlement Agreement (Dkt. #71), as "Pl. Br."; to Defendants' Opposition to Plaintiff's Motion to Enforce the Parties' March 24, 2016 Settlement Agreement (Dkt. #73), as "Def. Opp."; and to the Memorandum of Fact and Law in Reply on Plaintiff's Motion to Enforce the Parties' March 24, 2016 Settlement Agreement (Dkt. #74), as "Pl. Reply."  The Court also refers to the transcript of its April 5, 2016 conference with the parties as "Conference Tr."

The Court pauses to acknowledge, with gratitude, the *pro bono* assistance provided to Defendants by Lincoln Square Legal Services, under the auspices of Fordham Law School.

2

other disposition.  (*Id.* at ¶¶ 25-26(a)-(c)).  Plaintiff also sought monetary damages "in excess of $1,000,000" and attorneys' fees and costs.  (*Id.* at ¶ 26(d)-(e)).

In the early stages of this litigation, Defendants were represented by counsel, who proposed filing a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  (*See* Dkt. #14).  Shortly thereafter, counsel moved to withdraw, citing Defendants' inability to pay; the Court granted the motion in December 2015, and allowed Defendant Stier, but not her corporation, to proceed *pro se*.  (Dkt. #20-21).  By letter dated January 8, 2016, the parties jointly informed the Court that they wished to pursue a settlement conference with Magistrate Judge Francis.  (Dkt. #22).  The Court referred this case to Magistrate Judge Francis for a settlement conference but noted that because the corporate defendant did not have counsel, it would not participate.  (Dkt. #23).  And so began the series of events giving rise to the present dispute.

On February 24, 2016, Magistrate Judge Francis held a settlement conference with the parties.  (February 24, 2016 Minute Entry).  Though there is no entry on the docket reflecting a second settlement conference, the parties agree that Magistrate Judge Francis held a second conference on March 21, 2016.  (*See* Pl. Aff. ¶¶ 15, 18; *id.* at Ex. K).  On March 22, 2016, the Court ordered the parties to submit a joint letter by March 28, 2016, regarding the status of settlement discussions.  (Dkt. #24).  On March 24, 2016, Magistrate Judge Francis held a telephonic conference with the parties.  (March 24, 2016

Minute Entry).  Following the March 24, 2016 telephonic conference, a law clerk for Magistrate Judge Francis circulated a Stipulation and Order of Settlement (the "Stipulation") to the parties that had been "revised as discussed in your call with Judge Francis this morning."  (Pl. Aff., Ex. A).  She asked that the parties "review it and contact Chambers … to inform Judge Francis if it is acceptable."  (*Id.*).  The Stipulation provided as follows:

(i)     As of April 15, 2016, Defendants would remove and would not restore or disseminate the "28-day Critical Reading Intensive" from their website;

(ii)    The parties would be permitted to continue to operate in the SAT tutoring and test preparation field;

(iii)   The parties would seek the other's written permission to use any part of the other's works "in a manner that legally requires attribution";

(iv)    The parties would not infringe on the other's works;

(v)     The parties would refrain from defaming one another;

(vi)    The parties would "exchange mutual general releases upon the execution of this Stipulation";

(vii)   The action would be dismissed "[u]pon exchange of said mutual general releases[] and execution of this Stipulation[.]"

(Pl. Aff., Ex. A).  The Stipulation contained signature blocks for Plaintiff, her counsel, Defendant Stier, and the corporate Defendant.  Plaintiff's counsel, Bonnie P. Josephs, responded about 30 minutes later stating, "Ms. Meltzer is satisfied with the revised language of the proposed settlement stipulation" and noted further that Plaintiff would sign the agreement.  (*Id.* at Ex. B).  About one hour following, Defendant Stier wrote back and said: "Looks great to me."  (*Id.* at Ex. C).

4

The next morning, on March 25, 2016, Defendant sent an email with the subject line "a concern" to Magistrate Judge Francis's Chambers, on which Plaintiff and her counsel were copied. (Pl. Aff., Ex. V). Defendant Stier informed Chambers that she had received a phone call from a representative of the legal department at *The New York Times*, who claimed to have gotten "a second call from a woman 'reporting me' for copyright violation." (*Id.*).[3] At that time, Defendant observed that "this is not germane to the settlement," but that she felt "it is important to put this development on the record." (*Id.*).

About one hour later, a law clerk wrote to the parties that Magistrate Judge Francis was pleased that the parties "have agreed to sign the Stipulation," and instructed Plaintiff's counsel to send a finalized release to Defendant; the parties were to separately sign releases and mail the originals to Chambers. (Pl. Aff., Ex. H). That afternoon, Plaintiff's counsel sent to Magistrate Judge Francis's Chambers an electronic copy of a Settlement Stipulation and Order signed by Plaintiff and her counsel, as well as a release executed by Plaintiff. (*Id.* at Ex. I). Plaintiff's counsel sent to Defendant the cover page of her transmission to Chambers. (*Id.*). Plaintiff's counsel then wrote an email to Defendant asking her to prepare a joint letter to inform the Court that the parties had settled the case. (Stier Decl., Ex. B). Defendant did not respond to the email. (*Id.* at ¶ 10).

---

[3]  Plaintiff admitted to the Court that, in a regrettable lapse in judgment, she had called *The New York Times* on March 23, 2016 — in between the in-person and telephonic conferences before Magistrate Judge Francis — to inform the *Times* that she believed Defendants were using the *Times*' protected material without permission. (Conference Tr. 17:8-18:15).

On March 28, 2016, the Court received a submission from Plaintiff's counsel styled as a "proposed joint letter" stating "[t]he parties to this action, with the assistance of Magistrate Judge Francis, have settled the action as of March 25, 2016," and would "compl[y] … with the March 25, 2016 direction of Magistrate Judge Francis as to the means of submitting the signed Settlement Stipulation and Order and cross releases." (Dkt. #25 (attached as Exhibit J to Plaintiff's Affidavit)). Defendant Stier did not sign this letter, and the cover page to the letter stated that Defendant told Josephs that "she 'needs more time' to determine whether to co-sign the proposed letter." (*Id.*). Also on March 28, 2016, the Court received a letter from Defendant Stier explaining her hesitance to sign. (Dkt. #26 (attached as Exhibit K to Plaintiff's Affidavit)). She informed the Court that Magistrate Judge Francis had "circulated a draft settlement stipulation that I was prepared to execute," but that she was reluctant to sign in light of the phone call she received from *The New York Times* — a call that prompted concern that Plaintiff would not abide by the terms of the agreement. (*Id.*).

In light of the parties' divergent positions on settlement, the Court ordered the parties to appear for a conference on April 5, 2016. (Dkt. # 26 (Attached as Exhibit L to Plaintiff's Affidavit)). At the conference, Defendant Stier made clear her opposition to entering a settlement with Plaintiff without clear enforcement mechanisms. (Conference Tr. 29:12-13, 35:24-36:6). Plaintiff's position was that the Stipulation represented the totality of the agreement between the parties and was final. (*Id.* at 5:18-6:5). Plaintiff's

counsel stated she would file a motion to enforce the settlement (*id.* at 8:4-6), but Defendant requested additional time to consider whether she would sign the Stipulation or move forward with motion practice — either on Plaintiff's proposed motion to enforce or Defendants' proposed motion to dismiss (*id.* at 48:24-49:1). Thereafter, the parties continued settlement negotiations — including two additional settlement conferences — for several months; when those efforts proved unsuccessful, this motion followed. (*See* December 2, 2016 Minute Entry; December 23, 2016 Minute Entry). Plaintiff now seeks an order enforcing the Stipulation, an award of damages under a theory of promissory estoppel, and sanctions against Defendant Stier.

## DISCUSSION

### A. Applicable Law

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." *Meetings & Expositions, Inc.* v. *Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974). Whether state or federal common law governs a dispute over a putative settlement remains an open question in the Second Circuit, but "there is no material difference between the applicable state law or federal common law standard." *Kaczmarcysk* v. *Dutton*, 414 F. App'x 354, 355 (2d Cir. 2011) (summary order) (quoting *Ciaramella* v. *Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997)). A settlement agreement — whether written or oral — is a "contract that is interpreted according to general principles of contract law." *Omega Eng'g Inc.* v. *Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005).

Generally speaking, parties are free to settle lawsuits without memorializing the agreement in writing, and these agreements are enforceable like any other oral contract. *Winston* v. *Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). Importantly, "[t]he lynchpin of any settlement agreement is the mutual assent of parties to the terms of the settlement." *Doe* v. *Kogut*, No. 15 Civ. 07726 (SN), 2017 WL 1287144, at *4 (S.D.N.Y. April 6, 2017) (citing *Register.com, Inc.* v. *Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)). To discern the parties' intent to enter a settlement agreement, "a court must look to the words and deeds of the parties which constitute objective signs in a given set of circumstances." *Winston*, 777 F.2d at 80. If, based on the parties' objective intent, a court finds a "deliberate, strategic choice to settle, a court cannot relieve [the repudiating party] of that choice simply because his assessment of the consequences was incorrect." *Powell* v. *Omnicom, BBDO/PHD*, 497 F.3d 124, 128 (2d Cir. 2007) (citation omitted).

To determine under federal common law whether the parties intended to be bound to an oral or unsigned settlement agreement, courts in this Circuit apply the four-factor *Winston* test, which asks whether: (i) there has been an express reservation of the right not to be bound in the absence of a writing; (ii) there has been partial performance of the contract; (iii) all of the terms of the alleged contract have been agreed upon; (iv) the agreement at issue is the type of contract that is usually committed to writing. *Winston*, 777 F.2d at 80. No one factor is decisive; each informs the analysis. *Ciaramella*, 131 F.3d at 323. While a binding settlement agreement should not be "lightly cast aside,"

*Willgerodt* v. *Hohri*, 953 F. Supp. 557, 560 (S.D.N.Y. 1997), "[e]nforcing premature oral settlements against the express intent of one of the parties will not further a policy of encouraging settlements," and may in fact have the opposite, and undesirable, effect, *Ciaramella*, 131 F.3d at 323.

It is not clear whether New York Civil Practice Law and Rules § 2104 applies to this dispute. *See, e.g.*, *Oparah* v. *N.Y.C. Dep't of Educ.*, No. 12 Civ. 8347 (JGK), 2015 WL 4240733, at *8 (S.D.N.Y. July 10, 2015). The weight of authority in this Circuit suggests that a court need only apply federal common law when evaluating a settlement in a case premised on federal question jurisdiction. *Id.* at *5. But because the Second Circuit has not addressed this issue directly, the Court will consider the application of § 2104, which requires that a settlement agreement be set forth in writing or entered into the record by counsel in open court. N.Y. C.P.L.R. § 2104.

Finally, the Court is mindful that Defendant Stier, now ably represented by counsel, was proceeding *pro se* at the time of the settlement discussions at issue. Accordingly, the Court is careful to view her actions at the time with the deference typically afforded *pro se* parties, while declining to extend this treatment to Defendants' counseled legal arguments in opposition to Plaintiff's motion. *See generally Tracy* v. *Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) ("It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants."); *Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) ("It is well established that the submissions of a *pro se*

litigant must be construed liberally and interpreted to raise the strongest arguments they suggest." (internal quotation marks and citation omitted)).

## B.    Analysis

### 1.    The *Winston* Factors Do Not Counsel in Favor of Enforcing the Agreement

#### a.    Intent to be Bound Absent a Written Agreement

While no one *Winston* factor is decisive, "where there is a writing between the parties showing that one party did not intend to be bound[,] a court need look no further than the first factor." *Kaczmarcysk*, 414 F. App'x at 355 (quoting *RKG Holdings, Inc.* v. *Simon*, 182 F.3d 901, 901 (2d Cir. 1999)). Ultimately, the analysis turns on the parties' intent, and this can be demonstrated with equal force through their conduct. *See Winston*, 777 F.2d at 81 ("Although neither party expressly reserved the right not to be bound prior to the execution of a document, language in the correspondence does reveal such an intent."). Because the Court is unable to divine the subjective intent of the parties, their objective intent, shown through their overt acts, controls. *Oparah*, 2015 WL 4240733, at *5.

Plaintiff is adamant that the parties reached a binding, oral settlement during the March 24, 2016 telephonic conference before Magistrate Judge Francis, which settlement was later memorialized in "unequivocal written consent" by email. (Pl. Br. 2; *see also* Pl. Aff. ¶ 22). But what Plaintiff characterizes as "a classic contract case of 'offer and acceptance'" (Pl. Br. 2), is in fact more complicated. Defendant Stier states that "[i]t was always [her] understanding that the draft had to be signed by both parties in order to take

10

effect." (Stier Decl. ¶ 9). And Defendant's understanding is supported by the plain text of the Stipulation and the parties' conduct. The Stipulation begins, "It is *hereby* stipulated and *agreed* that the above-captioned action is settled *in accordance with the following*[.]" (Pl. Aff., Ex. A (emphases added)). Like the language in *Ciaramella* — where the Second Circuit declined to enforce a non-binding preliminary agreement — this language "demonstrates that only the terms of the settlement agreement, and not any preexisting pact, would legally bind the parties." 131 F. 3d at 324. The Stipulation's final two provisions make clear that the agreement would not take effect until signed. Paragraph six reads: "The parties shall exchange mutual general releases *upon the execution of this Stipulation*." (Pl. Aff., Ex. A (emphasis added)). And paragraph seven reads: "Upon exchange of said mutual general releases *and execution of this Stipulation*, the Action shall be dismissed[.]" (*Id.* (emphasis added)).

These clauses make plain that the Stipulation needed to be signed to accomplish the two primary goals of the settlement negotiations — exchanging general releases and dismissing this case — both of which are, of course, vital to a meaningful resolution. *See CAC Grp. Inc.* v. *Maxim Grp. LLC*, 523 F. App'x 802, 805 (2d Cir. 2013) (summary order) ("This language indicates that the parties understood that the written agreement would effectuate a binding contract and not merely memorialize a contract that had already been entered into." (citing *Ciaramella*, 131 F.3d at 324)). To enforce the unexecuted Stipulation would render the language requiring execution a nullity, and this result cannot stand. *Olin Corp.* v. *Am. Home Assurance Co.*, 704 F.3d 89, 99

(2d Cir. 2012) ("Any interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." (internal quotation marks omitted)). Because the parties' intent is ascertained from the plain meaning of the contract and not from extrinsic evidence, *Katel Ltd. Liability Co.* v. *Am. Tel. & Tel. Corp.*, 607 F.3d 60, 64 (2d Cir. 2010), the Court finds that the parties did not intend to be bound absent an executed settlement agreement.

That said, the extrinsic evidence in the record bolsters this finding. Following the March 24, 2016 telephonic conference, Magistrate Judge Francis's law clerk wrote to the parties, attaching the Stipulation, and asked the parties to "[p]lease review it and contact Chambers at your earliest convenience to inform Judge Francis *if it is acceptable*," thus indicating that it was an open question whether the parties would agree to the then-most-recent iteration of the agreement. (Pl. Aff., Ex. A (emphasis added)). Plaintiff's counsel wrote back with a clear acceptance of the Stipulation's terms and explicitly referenced the need to sign the agreement: "I report that Ms. Meltzer is satisfied with the revised language of the proposed settlement stipulation. ... Please let me know how the signing of the stipulation and releases should be effected." (*Id.* at Ex. B). Defendant wrote back with a less clear endorsement: "Looks great to me." (*Id.* at Ex. A). Defendant claims that her email was directed at "the revised language of the third paragraph" and not "the agreement as a whole." (Stier Decl. ¶ 8). The Court is mindful that Defendant was representing herself *pro se* at the time of this exchange and is reluctant to

12

bind her to an agreement based on a four-word email. *See Wade* v. *City of N.Y.*, No. 15 Civ. 6542 (BMC), 2017 WL 2817029, at *2 (E.D.N.Y. June 29, 2017) (declining to bind *pro se* litigant to a settlement agreement reached following an off-the-record conference with a magistrate judge). Unlike Plaintiff's counsel, Defendant did not say, "where do I sign?" Instead, "Looks great to me" falls far short of a clear indication that she intended to be bound to the Stipulation.

The very next morning, Defendant wrote to Magistrate Judge Francis's Chambers to voice her concern about Plaintiff's phone call to *The New York Times.* (Pl. Aff., Ex. V). Plaintiff makes much of Defendant's statement that her concern was "not germane" to the settlement (Pl. Aff. ¶¶ 79-82), but it is not clear this helps her argument. In point of fact, the phone call was not germane to the terms of the settlement, but it does appear to have been germane to Defendant's determination of whether she would enter into a binding agreement with the Plaintiff. (*See* Pl. Aff., Ex. V).[4] Defendant did not sign on to Plaintiff's proposed letter informing the Court that the case had been settled, but rather made clear that she needed more time to determine whether to sign the Stipulation. (*Id.* at Ex. J-K). Nor did the parties enter the terms of their agreement into the record in open court, which is often a basis to bind a repudiating party. *Aguiar* v. *New York*, 356 F. App'x 523, 525 (2d Cir. 2009) (summary order); *Powell,* 497 F.3d at 127; *Kogut,* 2017 WL 1287144, at *5; *Oparah*, 2015 WL 4240733, at *8. Plaintiff's best evidence on this prong is

---

[4]  In the alternative, while Defendant Stier might not have perceived the call to be germane to the settlement at the time of her statement, her subsequent discovery of the source and motivation of the call would surely have changed her view.

Defendant's email saying, "[l]ooks great to me" and, surely, this cannot suffice. The first *Winston* factor militates in favor of denying Plaintiff's motion to enforce.

### b.    Partial Performance

Plaintiff's cavalier insistence that Defendant "voluntarily … fully performed her principal obligations under the Settlement Stipulation and Order" (Pl. Br. 4) is similarly unavailing.  The Stipulation proposed that Defendants would "remove from Defendants' website, and shall not restore or disseminate in any medium, Defendants' entire '28-day Critical Reading Intensive' curriculum, which is the subject of this copyright action."  (Pl. Aff., Ex. A).  By letter dated March 28, 2017, Defendant Stier wrote to the Court regarding the phone call she received from *The New York Times* and requested additional time to decide whether to enter the proposed Stipulation with Plaintiff.  (*Id.* at Ex. K).  She added:  "*Having nothing to do with [P]laintiff's lawsuit*, I will be taking my on-line reading intensive program (the subject of this lawsuit) off of my website by April 15, 2016 because the SAT has changed and I am developing a new program, geared to the new test." (*Id.* (emphasis added)).  On April 7, 2016, Defendant again wrote to the Court to request another extension and added:  "In the meantime, I have removed my on-line critical reading intensive program … from my website, *as had always been planned*, and will be launching a new program, aligned with the new SAT, in the future." (*Id.* at Ex. O (emphasis added)).   On April 13, 2016, Defendant wrote to the Court once again about her attempt to obtain counsel and noted

that her "online critical reading intensive ... which was aligned with a test that no longer exists, remains offline and will not be reinstated." (*Id.* at Ex. P).

Plaintiff argues that Defendant's actions amount to performance under the Stipulation, "regardless of Defendant[s'] private motivation for having canceled the program[.]" (Pl. Reply 5). It is true that "partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *R.G. Grp., Inc.* v. *Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984). But this rule cannot operate with equal force where the party to be charged with performance explicitly denies that her actions are attributable to an agreement. *See Merrill Lynch Interfunding, Inc.* v. *Argenti*, 155 F.3d 113, 122 (2d Cir. 1998) (finding, in the statute of frauds context, that performance "reasonably explained by the possibility of other reasons for the conduct" does not amount to partial performance).

Defendant was careful at every turn to inform the Court and her adversary of her reason for taking the tutorial offline, and she was clear that it had nothing to do with the Stipulation. The Court is aware of Defendant's incentives at the time of this conduct and so views her disclaimers with healthy skepticism. But as Defendants note in their Opposition, Plaintiff's counsel was aware, and noted on the record during a conference with the Court in November 2015, that Defendant said she would likely revise her website to account for revisions to the SAT, notwithstanding any agreement between the parties. (Def. Opp. 13). And, indeed, the redesigned reading comprehension

section of the SAT was administered for the first time in March 2016. *Must Read: Student Reactions Following First Administration of the New SAT*, COLL. BD. (Mar. 5, 2016), https://www.collegeboard.org/releases/2016/student-reactions-first-administration-new-sat (last visited on November 2, 2017). Plaintiff cites no authority for her contention that the Court should ignore Defendant's stated reason for removing the disputed content from her website. Ultimately, the Court views Defendant's performance as equivocal at best, and this significantly undercuts Plaintiff's attempt to cast Defendant's actions as performance under a binding agreement. On balance, the second *Winston* factor also weighs against enforcement of the Stipulation.

### c. Agreement as to All Material Terms

Third, the Court looks to whether the parties reached agreement about all material terms of the Stipulation and finds that this factor weighs, moderately, in favor of enforcement. Plaintiff claims that the Stipulation "is a complete statement of the parties' agreement" (Pl. Br. 2), and there is no indication from the face of the agreement that any points were left unresolved. Defendants retort that the parties' divergent positions on whether signatures were required means that this was an open term in the agreement. (Def. Opp. 14). This argument, while clever, is not supported by the facts. The text of the Stipulation contemplates that it requires signatures to take effect — it has a signature block and references "execution" of the document. (Pl. Aff., Ex. A). Defendants plainly believed that signatures were required for the Stipulation to become binding. (*See, e.g.*, Stier Decl. ¶ 9). And Plaintiff agreed:

Plaintiff's counsel asked Magistrate Judge Francis's Chambers how to go about signing the Stipulation and she, in fact, signed it. (Pl. Aff., Ex. B). This would be a curious course of action if Plaintiff believed that signatures were not needed. There is no indication from the record that any other terms remained open. The email exchange between the parties and Magistrate Judge Francis's Chambers indicates that the parties reached agreement on the edits to the latest draft of the Stipulation and were not actively negotiating any open terms. (*Id.* at Ex. A). These facts may not evidence a clear intent by both parties to be bound to the Stipulation, but they do support a finding that there was agreement on its material terms.

### d. Type of Agreement That Is Typically Reduced to a Writing

Finally, the fourth *Winston* factor asks whether the disputed agreement is of the type normally reduced to writing. As other courts have noted, "it would be a strange test if the fourth factor always favored finding no agreement on the ground that settlement agreements usually are written." *Hostcentric Techs., Inc.* v. *Republic Thunderbolt, LLC*, No. 04 Civ. 1621 (KMW)(AJP), 2005 WL 1377853, at *9 (S.D.N.Y. June 9, 2005). For this reason, courts often look to the complexity of the agreement to determine whether the settlement ought to be memorialized in writing. *See, e.g.*, *Guardian Life Ins. Co. of Am.* v. *Calkins*, No. 12 Civ. 8836 (JGK), 2014 WL 61475, at *3 (S.D.N.Y. Jan. 6, 2014) (collecting cases).

As but one example, the *Winston* Court considered the amount of money at issue, the timeline of the agreement, and the number of drafts exchanged.

*Winston*, 777 F.2d at 83. And the *Winston* Court made clear that an agreement need not concern millions of dollars or span many pages to be complex; what matters is that the parties find sufficient complexity in their negotiations to warrant memorializing their agreement in writing. *Id.* Here, the Stipulation did not contemplate any monetary damages but its terms were meant to last in perpetuity. What is more, the terms of the agreement were sufficiently disputed that the parties met three times with Magistrate Judge Francis and exchanged several drafts. Where complexity is found in the eye of the beholder, even a short agreement such as this one can be so complex as to support a finding that it is of the sort that should be reduced to writing. *See id.* Given the parties' protracted negotiations, their adversarial posture, and the foundational principle that "the purpose of the agreement is to forestall litigation" the Court finds that "prudence strongly suggests that their agreement be written[.]" *Id.*

In sum, the *Winston* factors militate against enforcement of the unsigned Stipulation. Plaintiff maintains that her "central point, ignored by Defendant, is that Defendant loses nothing in the settlement and has nothing to gain by continuing the litigation." (Pl. Reply 2). That may well be so, but Plaintiff does not explain why this matters under *Winston*. There are no clear indicia of Defendants' intent to be bound to the agreement; ultimately, this is what controls.

### 2. N.Y. C.P.L.R. § 2104 Does Not Counsel in Favor of Enforcing the Agreement

To review, it is not clear whether N.Y. C.P.L.R. § 2104 — which requires that settlement agreements be "in a writing subscribed by [a party] or his attorney or reduced to the form of an order and entered" — applies here. *See Kogut*, 2017 WL 1287144, at *4. In any event, the Court finds that the parties' unsigned Stipulation is not enforceable under § 2104. Defendant Stier did not "subscribe[]" to the Stipulation, and it has not been entered by the Court. While there is a question as to whether an on-the-record recitation of a settlement suffices under § 2104, *Oparah*, 2015 WL 4240733, at *9, those facts are not present here.

### 3. The Agreement Is Not Enforceable Against the Unrepresented Corporate Defendant

At the time of these settlement negotiations, The Perfect Score Project, LLC, the corporate Defendant in this case, was not represented by counsel. The Second Circuit is clear that a limited liability corporation cannot appear in court without an attorney. *Lattanzio* v. *COMTA*, 481 F.3d 137, 140 (2d Cir. 2007) (holding that individual proceeding *pro se* could not represent his solely-owned limited liability corporation in court). For this very reason, the Court specified in its Order, dated January 8, 2016, referring this matter to Magistrate Judge Francis for settlement: "Due to the corporate Defendant's lack of counsel, the corporate Defendant will not be able to participate in the settlement conference." Plaintiff acknowledges as much. (Pl. Aff. ¶ 13). The parties' inclusion of the corporate Defendant in the Stipulation's signature

block is not enough to override this well-settled law. The Stipulation is not enforceable against the corporate Defendant.

### 4. Plaintiff Is Not Entitled to Recovery on a Theory of Promissory Estoppel

Plaintiff attempts to recover, in the alternative, on a theory of promissory estoppel. To prevail, Plaintiff must show "reasonable and detrimental reliance upon a clear and unambiguous promise." *Sec. Plans, Inc.* v. *CUNA Mut. Ins. Soc.*, 769 F.3d 807, 816 (2d Cir. 2014). Plaintiff alleges that Defendant made promises to enter the Stipulation in (i) her March 24, 2016 email to Magistrate Judge Francis's Chambers, (ii) her appearance before the Court at the April 5, 2016 conference, and (iii) her letters to the Court dated March 28, April 7, and April 13, 2016. (Pl. Br. 6). Plaintiff states that she has relied on those promises and has thus incurred "the cost of these post-settlement proceedings" and has suffered through a "delay in resolving the instant action by means of the Settlement Stipulation and Order." (*Id.*). Defendants rebut this claim with ease.

Taking the latter element first, Defendants argue that Defendant Stier never made a clear and unambiguous promise to sign the Stipulation. Once again, Plaintiff hangs her hat on Defendant's March 24, 2016 email saying, "[l]ooks great to me" (Pl. Br. 6), but Defendants argue that this cannot suffice (Def. Opp. 18 (citing *Henneberry* v. *Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 444 (S.D.N.Y. 2006))), and the Court agrees. As discussed above, Defendant's email evidences little more than her approval of the latest round of edits. Unlike Plaintiff, she did not write back asking, "where and how do I

sign?" The Court will not convert her short email into the unambiguous promise Plaintiff seeks.

Defendants further argue that Defendant Stier's March 25, 2016 email citing concerns about the phone call from *The New York Times*, as well as her March 28, 2016 letter to the Court and email to Plaintiff's counsel evidence her clear and unambiguous efforts to *disclaim* the Stipulation. (Def. Opp. 18-19). Again, the Court agrees. Defendant's March 25, 2016 email recites that her concerns are "not germane" to the settlement, but does not speak one way or the other to whether Defendant will sign the Stipulation. (Pl. Aff., Ex. V). In her March 28, 2016 letter to the Court, Defendant states she "was prepared to execute" the Stipulation but that she needed more time to "consider the best way to move forward … *whether* to sign the settlement agreement … or whether to proceed with filing a motion to dismiss[.]" (*Id.* at Ex. K (emphasis added)). Defendant's email of the same day to Plaintiff's counsel acknowledges that she "ha[d] been interested in settling the case" but articulates, at length, her reluctance to do so. (Stier Decl., Ex. C). It is difficult to see how Plaintiff could construe any of these communications as a promise, much less a clear one, to enter into a binding settlement.

The Court observes that Defendant Stier's statements to the Court at the April 5, 2016 conference and in her letters dated April 7 and April 13, 2016, are similarly ambiguous. During the April 5, 2016 conference, Defendant spoke to the Court about her "concerns," that she had been willing to settle the case, but that she was "at a loss" about how to proceed. (Conference Tr. 11:19-

12:12).  It is evident from her remarks that Defendant did not believe the Stipulation to be binding and was undecided about whether to sign it.  Finally, Defendant's April 7 and April 13, 2016 letters to the Court requested extensions of time to decide how she would like to proceed.  (Pl. Aff., Ex. O-P). Again, it is hard to see how any of these statements amounts to a clear promise to sign the Stipulation.  In sum, "the entire history of the parties' negotiations made it plain that any promise or agreement at that time was conditional upon the signing of a written contract," and there was no clear and unambiguous promise.  *R.G. Grp.*, 751 F.2d at 79.  In light of Defendant's clear statements that she did not want to enter into a settlement, Plaintiff's reliance is unreasonable.  *See Reprosystem, B.V.* v. *SCM Corp.*, 727 F.2d 257, 264-65 (2d Cir. 1984) (finding reliance unreasonable where the parties' course of dealing made plain that agreement needed to be reduced to an executed document).

Even if Plaintiff did reasonably rely on a clear promise, she cannot demonstrate injury.  Plaintiff claims that, in reliance on Defendant's promise to sign the Stipulation, she incurred the cost of litigating this motion to enforce. This makes no sense.  Plaintiff's theory of injury sounds, more appropriately, in breach of an oral contract, not in promissory estoppel.  The only action Plaintiff appears to have taken in reliance on Defendant's alleged promise is her own signature of the Stipulation and the general release.  But because this is the very result that Plaintiff hopes to bring about in filing this motion, she cannot credibly state that this reliance was to her detriment.

**5.      Defendant Stier Did Not Breach a Good Faith Obligation to Enter a Settlement**

Finally, Plaintiff alleges that Defendant Stier "breached her duty of good faith in failing to sign the Settlement Stipulation and Order after having performed her principal obligations under the Settlement Stipulation and Order[.]"  (Pl. Br. 6-7).  Under New York law, where parties have a "binding preliminary agreement … the parties are bound only to make a good faith effort" to reach an agreement but are under no obligation to succeed in those efforts.  *L-7 Designs, Inc.* v. *Old Navy, LLC*, 964 F. Supp. 2d 299, 307 (S.D.N.Y. 2013).  Assuming that the parties had a binding preliminary agreement, the Court cannot find that Defendant failed to make a good faith effort to reach a final agreement.  Defendant attended three settlement conferences with Magistrate Judge Francis and, after she expressed her reluctance to proceed further, made a concerted effort to retain counsel and decide whether to settle the case.  Plaintiff omits mention of the fact that she called *The New York Times* purely out of spite during the pendency of the parties' settlement talks when she began to realize that the negotiations might not go her way.  If anything, it is Plaintiff's behavior that derailed the settlement and precipitated the filing of this costly and avoidable motion.  Plaintiff is not entitled to any relief, in the form of sanctions or otherwise, on this claim.

**CONCLUSION**

Nothing in this Opinion should be taken as an indication from this Court that settlement of this action would not be the best course of action. To the contrary, the Court believes prompt settlement of this case would be optimal for all parties. That said, on this record and for the reasons set forth above, Plaintiff's motion to enforce is DENIED. The Clerk of Court is directed to terminate the motion at docket entry 69.

The parties are hereby ORDERED to appear for a conference with the Court on Monday, November 20, 2017 at 12:00 noon in Courtroom 618 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007.

SO ORDERED.

Dated:      November 2, 2017
            New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge